RENDERED: MARCH 14, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000390-DGE

DATE 4/4/19 Kim Redmon, DC

DAVID MORTON AND DARLENE MORTON      APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.      CASE NO. 2017-CA-001305-MR
MONTGOMERY CIRCUIT COURT NO. 12-CI-00170

BRUCE TIPTON      APPELLEE

**OPINION OF THE COURT BY JUSTICE HUGHES**

**AFFIRMING**

In this grandparent visitation case, David and Darlene Morton, custodial maternal grandfather and step-grandmother, challenge the trial court's award of limited grandparent visitation to Bruce Tipton, paternal grandfather. The Mortons maintain the trial court failed to apply the *Walker* "best interest of the child" factors and further failed to make the grandparent visitation determination based upon clear and convincing evidence, the standard enunciated in *Walker*. Although the trial court did not cite *Walker v. Blair*, 382 S.W.3d 862, 871 (Ky. 2012), we conclude the findings of fact reflect proper consideration and application of the best interest factors. As for the standard of proof, the trial court properly applied the preponderance of the evidence standard because the higher clear and convincing evidence standard only applies in the event of a grandparent visitation dispute involving a custodial

parent. Accordingly, we affirm the Court of Appeals.

## FACTUAL[1] AND PROCEDURAL BACKGROUND

Bruce Tipton (Tipton) is the paternal grandfather of the minor children CT, born March 8, 2007, and KT, born July 31, 2009. Following their births, they and their parents, Brian Tipton and Roxanna Swartz, resided with Tipton for a period of time. When not residing with Tipton, the four visited Tipton almost every day until CT and KT were approximately two (2) years and nine (9) months and five (5) months of age, respectively. Both Brian and Roxanna have histories of drug abuse, and they engaged in domestic violence in the presence of their children.

In January 2010, the Cabinet for Health and Family Services (the Cabinet) filed petitions alleging that CT and KT were neglected by both parents because of the parents' drug abuse and that the family was not stable because they were dependent upon others to provide them housing. CT and KT were placed with David and Darlene Morton, maternal grandfather and step-grandmother. In March 2011, the Mortons were granted permanent custody of CT and KT and, by the same order, the Powell Circuit Family Court included a provision for Tipton to have supervised visitation with CT and KT at the Mortons' discretion. At the time of this decision, as later found by the Montgomery Circuit Court, the Powell Circuit Family Court had held multiple hearings with the parties, had received reports and Tipton's home evaluation

---

[1] The trial court's findings of facts comprised approximately 30 pages of its order.

from the Cabinet,[2] and was in the best position to evaluate whether it was in CT and KT's best interest to have visitation with Tipton. In June 2012, because the Mortons moved their residence, the case was transferred to Montgomery District Court.

From April 2010 and later pursuant to the March 2011 order, Tipton visited with CT and KT for one (1) hour per week, either with or without the children's father, Brian. The visits took place in Montgomery County at a restaurant, a park, or the Mortons' home. At some point, Tipton asked the Mortons for increased visitation, which they denied. In October 2012, Tipton filed this action in Montgomery Circuit Court, specifically petitioning for "grandparent timesharing."

The Mortons requested that a specific timesharing schedule be denied and, as part of their objection, noted that Tipton's showing the young girls a dead pig carcass had disturbed them. Tipton testified that the pig, shown at the girls' request was not bloody, having been slaughtered for food a couple of days before. Darlene described the incident as causing great trauma to the children, who became fearful of Tipton from that point forward.[3]

---

[2] Tipton was considered for custodial placement at the request of the biological father, Brian Tipton. The Cabinet performed two evaluations, one for potential custodial placement and one relative to the visitation request.

[3] Notably, as to David Morton, the biological maternal grandfather, the trial court found that he failed to be present and/or participate in meetings with the Guardian ad Litem (GAL) and also failed to either appear and/or participate in court proceedings. Darlene testified that he works 10 hours per day through the week and works all weekend on the family farm.

While the Cabinet conducted an evaluation of Tipton's home, the Montgomery Circuit Court ordered that Tipton have continued visitation with the children, setting a schedule for one (1) hour biweekly. The Cabinet's evaluation concluded that Tipton appears to love CT and KT; he has maintained ongoing contact and would like more contact with them; and he has the support of his church family, friends, and family. The Cabinet's concerns stemmed from some safety issues in the home, past reports of Tipton's spanking a significant other's minor child in 1989, and Brian's presence in the home given his significant criminal history. Following evaluation, the Cabinet did not recommend custodial placement with Tipton.

When the Mortons again objected to Tipton's request for increased visitation, they stated that Tipton's visitation with CT and KT had become an emotional strain. The trial court nevertheless granted Tipton weekly visits with the children, but, at the Mortons' request, appointed a GAL. Upon completing her investigation, the GAL did not recommend unsupervised visitation with Tipton at that time primarily due to CT and KT's uneasiness with him. The GAL recommended that until the children became more comfortable with Tipton, visitation be less frequent and in the least distracting environment for the children. Based upon the GAL's recommendation, the court ordered that CT and KT attend counseling.[4] Tipton maintained telephone communication and over the course of time he attended individual sessions with the children's

---

[4] CT was diagnosed with Post-Traumatic Stress Disorder attributable to a number of factors in her chaotic life with her parents.

4

therapist and discussed ways to appropriately communicate with children the ages of CT and KT.

In October 2014, with the children showing a lack of progress after fourteen months of therapy, the trial court ordered the children to be assessed by a therapist specializing in trauma. In November 2014, while in a session with her usual counselor, CT, age 7, disclosed that when she was around age 4, Tipton touched her while helping her wipe after going to the bathroom and that the touch felt inappropriate. The counselor reported this to the Cabinet and Darlene Morton filed an emergency protective order on behalf of CT and KT. The trauma therapist's report was received in December; CT discussed various things which made her feel anxious or sad, but there was no mention of the alleged touching by Tipton.

At Tipton's request due to the pending investigation of CT's allegations of inappropriate touching, the trial court suspended Tipton's contact with the children in a January 2015 order. In July, after the Kentucky State Police had completed its investigation into this alleged criminal act and indicated no charges would be filed, Tipton asked for reinstatement of his timesharing with CT and KT. This motion led to a final hearing in November 2015 at which Tipton; Kristy Smith, Tipton's daughter who has twins near the age of CT; and Scott Rogers, Tipton's pastor, testified on his behalf. Darlene Morton; Michelle Felty, the social worker for the Cabinet; and Amy Smith, CT and KT's counselor, testified on the Mortons' behalf. Amy Smith testified that she recommended that CT have no contact with Tipton. Felty's and the trauma

5

therapist's reports were admitted into evidence, along with Tipton's photo of his other granddaughters swinging on his front porch. The trial court took the matter under advisement but additionally ordered that family visits take place in Kristy Smith's home with Kristy, her two daughters, CT and KT, and Darlene Morton present, the intention being to help CT and KT feel comfortable around the paternal side of the family in anticipation of Tipton being incorporated into future family visits, if appropriate.

In February 2016, the EPO against Tipton was dismissed. The trial court found that there was no evidence that the alleged inappropriate touching was anything beyond that which occurred incidentally while Tipton helped wipe CT after she used the bathroom and was not done for sexual gratification.

In June 2016, observing that the family visits at his daughter's home had reportedly gone well, Tipton requested that his visitation with CT and KT be reinstated and that he be incorporated into the family visits. The Mortons opposed the motion. In July, the trial court granted Tipton visits at his daughter's home with the established family group. Afterward, the Mortons renewed a motion for a final order, stating the visits had not gone well. The trial court scheduled hearings in October and December to hear from others present at the visits. Kristy Smith, the children's aunt, testified that the two visits had gone well. Shirley Bowen, Darlene's sister, testified that the visit "did not go badly." No one testified or otherwise reported that either CT or KT was traumatized by these visits, acted out before or following these visits, or needed to return to counseling as a result of the visits.

6

On July 7, 2017, the trial court entered its final order consisting of approximately 30 pages of detailed findings of fact, ultimately concluding it is in the best interest of the children to be allowed to continue a relationship with Tipton through occasional supervised visitation. The trial court concluded that in this case, grandparent visitation rights do not interfere with the constitutional rights of the biological parents given that the parents do not have custody, do not have a set visitation schedule, and, indeed, their whereabouts are unknown. Tipton's visitation was limited to three (3) times per year and included the following restrictions: the visits are to occur at Kristy Smith's home, under her supervision, with her two daughters present; and Darlene Morton is to be present until CT feels comfortable enough for her to leave.

On appeal, the Court of Appeals concluded that the trial court properly applied the preponderance of the evidence standard and appropriately considered the relevant *Walker* factors. With those conclusions, the appellate court held that the trial court did not abuse its discretion in granting Tipton the very limited visitation with CT and KT as outlined. This Court granted discretionary review.

## ANALYSIS

The Mortons insist that the circuit court erred by not applying the *Walker* best interest factors and by not requiring Tipton to prove by clear and convincing evidence that visitation with him was in his grandchildren's best interests. Tipton counters that the circuit court actually considered the *Walker*

7

factors and that preponderance of the evidence is the appropriate standard of proof when a circuit court addresses a grandparent's request for visitation with a child not in the custody of his or her parents. Alternatively, Tipton insists that even if the higher clear and convincing evidence standard were applicable, the court in this case did not abuse its discretion.

In *Massie v. Navy*, 487 S.W.3d 443 (Ky. 2016), we were presented with a similar case, *i.e.*, a grandparent seeking visitation with a child who resided with a non-parent custodian, but the issue of the appropriate standard of proof was not preserved and hence this Court did not address it. Along with this case, *Massie* illustrates the struggles the bench and bar face when dealing with evolving domestic relations issues and changing family caregiving and living arrangements for which a way forward is not always clearly outlined by statute or even case law.[5] We find sufficient preservation of the issue of the proper standard of proof in this case to address it.

## I. The statutory framework and factors relevant to grandparent visitation.

---

[5] For example, in this case, KRS 405.021 was not cited as the authority by which the grandparent visitation dispute should be settled until the latter part of the lower court proceedings. Initially, both parties cited KRS Chapter 403 generally and KRS 403.270 in motions requesting an order for specific timesharing (Tipton) and, later, a final and appealable order regarding the children's best interest (the Mortons). However, six months after the final hearing (two months after *Massie* was issued), the Mortons cited KRS 405.021 in a motion for a final and appealable order. Prior to that, the Mortons had cited KRS 405.021 as a statute which allows grandparents' reasonable visitation, but only if it is in the child's best interest. This case history illustrates the common confusion regarding grandparent visitation issues.

Grandparent visitation in Kentucky is governed by statute. Kentucky Revised Statute (KRS) 405.021(1)(a),[6] often referred to as Kentucky's grandparent visitation statute, is contained in Title XXXV. Domestic Relations, Chapter 405. Parent and Child, and entitled **"Reasonable visitation rights to grandparents."** KRS 405.021(1)(a) currently provides: "The Circuit Court may grant reasonable visitation rights to either the paternal or maternal grandparents of a child and issue any necessary orders to enforce the decree if it determines that it is in the best interest of the child to do so." When the statute was originally adopted in 1976, it only applied if a child's parent was deceased. In 1984 the General Assembly extended the right of grandparents to petition for visitation to cases where the parent or parents of the child are not deceased. *Cole v. Thomas*, 735 S.W.2d 333, 334 (Ky. App. 1987). This Court, in *King v. King*, 828 S.W.2d 630, 632 (Ky. 1992) (overruled on other grounds), upheld the constitutionality of KRS 405.021(1)(a) and recognized that it seeks to balance the rights of the parents, the grandparents and the child. The underlying factual premise in early cases pursuant to the statute was a custodial parent objecting to visitation by a grandparent, plainly not the facts before us or in *Massie*. Although CT and KT's parents are not involved in this

---

[6] KRS 405.021 was amended in 2018, after being unchanged since 1996. The amendment added KRS 405.021(1)(b) and (c) regarding a rebuttable presumption where the grandparent's own child is deceased and he/she seeks grandparent visitation. Prior to that amendment, the provision now codified in KRS 405.021(1)(a) was codified in KRS 405.021(1). Although KRS 405.021(1)'s revision occurred after the initiation of this case, because the statutory text remained unchanged, we refer to the current codification of KRS 405.021.

case, the constitutional rights of custodial parents are nevertheless germane to our consideration of the issue before us.

In *Troxel v. Granville*, 530 U.S. 57, 61 (2000), the United States Supreme Court held that parents and grandparents are not on equal footing in a best interest of the child analysis such as the one required by KRS 405.021(1)(a).[7] Constitutionally, a fit parent has rights superior to all others when making decisions about the care, custody, and control of his or her children and that includes decisions about who may visit with the child. *Id.* at 66, 70. Furthermore, the law presumes that a fit parent acts in the child's best interest. *Id.* at 68. Consequently, in *Walker* we recognized a parent's decision regarding grandparent visitation must be given special weight. 382 S.W.3d at 870. The grandparent seeking visitation must overcome the constitutional presumption regarding the parent's visitation decision with clear and convincing proof that visitation with the grandparent is in the child's best interest. *Id.* at 866.[8] This use of the heightened clear and convincing evidence standard with the best interest analysis is often referred to as the modified best

---

[7] The Washington statute at issue in *Troxel* went beyond grandparent visitation. The statute provided that "Any person may petition the court for visitation rights at any time . . . [and] [t]he court may order visitation rights for any person when visitation may serve the best interest of the child . . . ." 530 U.S. at 61.

[8] The *Walker* Court maintained the clear and convincing evidentiary standard set in *Vibbert v. Vibbert*, 144 S.W.3d 292, 294 (Ky. App. 2004). *Vibbert* explained that "cases involv[ing] the fundamental right of parents to raise their children as they see fit without undue interference from the state, [require] the use of this heightened standard of proof." 144 S.W.3d at 295 (citing *Santosky v. Kramer*, 455 U.S. 745, 756 (1982)) (clear and convincing proof is mandated when the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money).

10

interest standard. *See Vibbert,* 144 S.W.3d at 294. The heightened modified standard contrasts with the preponderance of the evidence standard, the customary evidentiary standard in civil cases. *See Woods v. Commonwealth,* 142 S.W.3d 24, 43 (Ky. 2004) (citing *Aetna Insurance Co. v. Johnson,* 74 Ky. 587, 593 (1874)).

In *Walker,* this Court identified factors relevant to determining whether grandparent visitation is in the child's best interest despite such visitation being against the parent's wishes. Those factors include but are not limited to:

> 1) the nature and stability of the relationship between the child and the grandparent seeking visitation;
> 2) the amount of time the grandparent and child spent together;
> 3) the potential detriments and benefits to the child from granting visitation;
> 4) the effect granting visitation would have on the child's relationship with the parents;
> 5) the physical and emotional health of all the adults involved, parents and grandparents alike;
> 6) the stability of the child's living and schooling arrangements;
> 7) the wishes and preferences of the child; and
> 8) the motivation of the adults participating in the grandparent visitation proceedings.

*Walker,* 382 S.W.3d at 871.[9] Depending upon the circumstances of each case, some or all of these and other factors will be relevant to the best interest determination. *Massie,* 487 S.W.3d at 447.

In recent years, many grandparents have become increasingly involved in their grandchildren's lives, from seeing them on a regular basis to caring for them on a full- or part-time basis, if a parent is unable or unwilling to care for

---

[9] *Walker* adopted and supplemented the factors enumerated in *Vibbert,* 144 S.W.3d at 295.

11

the children.[10]  Many grandparents in the Commonwealth have temporary or even permanent custody of their grandchildren.  Although KRS 405.021(1)(a) is premised upon a custodial parent being present and responsible for the care and upbringing of the child, it is not uncommon today for a child to be cared for by someone other than a custodial parent.  Thus, grandparents are often seeking visitation from non-parent custodians and caretakers, including, as in this case, the child's other grandparents.  While the General Assembly has taken steps recently which recognize that grandparents may petition for visitation when other grandparents have been granted *temporary* custody,[11] this case rightfully reflects that KRS 405.021(1)(a) and its customary "best interest of the child" standard have been used for guidance when grandparents seek visitation of grandchildren in the permanent custody of someone other than their parent(s).  *See also Massie*, 487 S.W.3d 443 (KRS 405.021 applied where grandparent was seeking visitation from custodial uncle and aunt who may have had "full custody").

---

[10] *See* the preface to 2018 Ky. Acts ch. 197, which states in part "the opioid epidemic and rise in drug abuse has led to an increase in the number of families that are pulled apart" and "there are over 70,000 children in Kentucky that are no longer living with their parents, including over 8,000 children in foster care and over 30,000 homeless children."

[11] Enacted in 2018, KRS 620.090(6) states: "If custody is granted to a grandparent of the child pursuant to this section [regarding temporary custody orders], the court shall consider granting reasonable visitation rights to any other grandparent of the child if the court determines the grandparent has a significant and viable relationship with the child as established in KRS 405.021(1)(c)."

The applicability of KRS 405.021(1)(a) and the *Walker* factors to the current grandparent visitation case is not disputed. All parties agree that the statute and *Walker* are controlling but they disagree as to the standard of proof. Thus, this Court must decide, as a matter of law, the proper evidentiary standard to be used by the trial court when performing a KRS 405.021(1)(a) best interest analysis in a visitation dispute between a grandparent and a non-parent custodian. As often noted, we review matters of law *de novo*. *Auslander Properties, LLC v. Nalley*, 558 S.W.3d 457, 464 (Ky. 2018).

## II. The preponderance of the evidence standard is controlling when the custodian is not a parent.

A plain reading of KRS 405.021 reveals that it does not specify the standard of proof required to determine whether it is in a grandchild's best interest to visit with a grandparent. Prior to the United States Supreme Court's discussion of a parent's superior, constitutional rights in *Troxel*, Kentucky trial courts employed the preponderance of the evidence standard when performing a KRS 405.021 best interest analysis. *See Walker*, 382 S.W.3d at 868. In response to *Troxel*, this Court recognized in *Walker v. Blair* that parents have a fundamental liberty interest in the care, custody, and control of their children and, consequently, a heightened burden of proof, the clear and convincing evidentiary standard, must be used in order for a grandparent to be granted visitation under the best interest analysis when a parent objects.

The Mortons contend that while they are not the biological parents of CT and KT, they have raised the children as their own since 2010 and as long-

13

term permanent custodians, should receive the same presumptions and protections as a biological parent, including application of the clear and convincing evidentiary standard as to whether it is in the children's best interest for Tipton to be granted visitation with them. Tipton counters that the parents' liberty interest in the care, custody, and control of their children does not extend to non-parent custodians and consequently, no presumption exists under the Due Process Clause that the non-parent custodian is acting in the best interest of a minor child when denying a grandparent visitation. Tipton argues accordingly that the applicable standard here, as in most civil cases, is the preponderance of the evidence standard.

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Santosky v. Kramer*, 455 U.S. 745, 754–55 (1982) (quoting *Addington v. Texas*, 441 U.S. 418 (1979) (internal quotation marks and citation omitted)). The standard is "shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Id.* at 757 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976)). For the majority of civil cases, the minimum preponderance of the evidence standard applies and the risk of error is shared in roughly equal fashion, a position that is considered fundamentally fair. *See Addington*, 441 U.S. at 423. Application of the intermediate clear and convincing evidence standard is proper, however, when

14

the individual interests at stake in a state proceeding are both "particularly important" and "more substantial than mere loss of money." *Id.* at 424. "Because a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right," *Santosky*, 455 U.S. at 758–59 (citations and internal quotation marks omitted), this Court recognized the controlling clear and convincing standard's application to the KRS 405.021(1)(a) analysis in *Walker*. "Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss." *Id.* at 758.

As noted by *Hardin v. Savageau*, in Kentucky, "[a]mong the most common of cases which require proof by clear and convincing evidence are termination of parental rights, illegitimacy of a child born in wedlock, unfitness of a natural parent for custody of a child, proof of a lost will, and fraud." 906 S.W.2d 356, 357 (Ky. 1995) (citations omitted). Undoubtedly when litigating a parental rights case, the private interest affected is of superior interest and the risk of error from using a preponderance standard is substantial. However, the same cannot be said when a non-parent custodian disputes grandparent visitation.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." As the United States Supreme Court has made clear, "there is a constitutional dimension to

15

the right of parents to direct the upbringing of their children." *Troxel*, 530 U.S. at 65–66 (summarizing cases). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69 (citation omitted).

However, as in the present case, when the custody of the parent fails, the Commonwealth may either exercise custody itself or appoint someone else to do so. The liberty interest at issue in *Walker*, the interest of parents in the care, custody, and control of their children — which commands a heightened burden of proof — is simply not present when non-parents are granted custody by the State. Stated differently, the superior rights of a parent are not bestowed on a non-parent custodian, regardless of the custodian's relationship to the child or the length of their custodial relationship. Consequently, the presumption that a fit parent would make decisions in the child's best interest does not transfer to the non-parent and is not part of the analysis.

Although fit parents and grandparents seeking visitation with a grandchild are not constitutionally on equal footing and a heightened burden of proof is required to be met for a trial court to grant the disputed visitation, the

16

same is not true of grandparent visitation disputes involving a non-parent custodian. As the Commonwealth has an interest in preserving and promoting the welfare of the children, our legislature has recognized with its acts that children should have the opportunity to benefit from relationships with their grandparents. The opportunity to benefit from that relationship may indeed be greater when circumstances are such that the parents no longer have custody of the children. Without a fundamental constitutional right at issue, we find no authority for imposing the clear and convincing standard on the best interest of the child analysis. Unless the legislature provides otherwise, the non-parent custodian and a grandparent are on equal footing under KRS 405.021(1)(a) and the preponderance of the evidence standard for determining whether grandparent visitation is in the child's best interest is fundamentally fair and proper.

Although the trial court in this case did not explicitly identify the standard of proof it employed, it did state as an initial conclusion of law that "[g]randparent visitation rights do not interfere with the constitutional right of the biological parents in this case, given that the parents' whereabouts are unknown, the parents do not have custody and the parents do not have a set visitation schedule." This statement and the remainder of the order strongly suggest that the trial court correctly employed the typical preponderance of the evidence standard. The Court of Appeals also identified that standard as the appropriate standard in cases such as this and, for the reasons stated, we affirm.

17

Before advancing to the next issue, we note that since the inception of this action, the 2018 General Assembly passed House Bill 517, an act relating to grandparent visitation, which amended KRS 405.021 and KRS 620.090. The act's preface acknowledges the amendments are needed due to the crucial role many grandparents play in their grandchildren's healthy development, especially when the parents abuse drugs and the children no longer live with their parents. Its preface states *inter alia,* "studies have shown that relationships between adolescents and grandparents contribute to the adolescents' well-being"; "studies have also shown that grandparents are instrumental in times of family adversity and help the whole family to survive a crisis"; "emotionally close ties between grandparents and grandchildren provide a wide variety of benefits to both grandparent and grandchild"; "the opioid epidemic and rise in drug abuse has led to an increase in the number of families that are pulled apart"; "over 70,000 children in Kentucky . . . are no longer living with their parents, including over 8,000 children in foster care and over 30,000 homeless children"; "the presence of healthy, supportive grandparents has been shown to be a factor in distinguishing well-functioning children of drug abusers"; and "there is a rapidly increasing number of grandparents who serve as the primary caregivers for children."

As mentioned above, under KRS 620.090 which deals with temporary custody orders, a new subsection (6) was created which states: "If custody is granted to a grandparent of the child pursuant to this section, the court shall consider granting reasonable visitation rights to any other grandparent of the

18

child if the court determines the grandparent has a significant and viable relationship with the child as established in KRS 405.021(1)(c)." Newly created KRS 405.021(1)(c) states:

> In order to prove a significant and viable relationship under paragraph (b) of this subsection, *the grandparent shall prove by a preponderance of the evidence* that:
> 1. The child resided with the grandparent for at least six (6) consecutive months with or without the current custodian present;
> 2. The grandparent was the caregiver of the child on a regular basis for at least six (6) consecutive months;
> 3. The grandparent had frequent or regular contact with the child for at least twelve (12) consecutive months; or
> 4. There exist any other facts that establish that the loss of the relationship between the grandparent and the child is likely to harm the child.

(Emphasis added.) KRS 620.090(6) is noteworthy for its impact on future grandparent visitation cases involving temporary custody orders.

To reiterate, going forward, trial courts must use the preponderance of the evidence standard when considering grandparent visitation if someone other than a parent, including another grandparent, is the grandchild's custodian. We turn now to whether the trial court properly considered the factors relevant to determining whether grandparent visitation is in a child's best interests.

### III. The trial court properly considered the *Walker* factors and did not abuse its discretion.

As noted earlier, the facts of each case will determine the factors to be considered when determining whether grandparent visitation is in the child's best interest. Although the *Walker* factors were developed in the context of a parent-grandparent visitation dispute, the factors are readily amenable to

19

disputes not involving a parent – the references to "parents" are simply replaced with "non-parent custodian" or other fitting reference. The factors, while not necessarily identifying all circumstances to be considered, reflect a holistic approach to the assessment when determining the best interest of the child. Upon review of the trial court's approximately 30 pages of findings of fact, which included a review of the case from its inception, we conclude that the trial court considered the *Walker* factors, albeit without reference to the case itself.

The Court of Appeals identified various findings of fact which reflected the trial court's careful consideration of the visitation factors, even though *Walker* was not cited. For example, the trial court found Tipton was involved with the children since birth and that the relationship had been interrupted due to Brian and Roxanna's substance abuse problems and Darlene's subsequent animosity toward Tipton. The trial court found it was in the children's best interest to have contact not only with Tipton but also with the paternal side of the family through occasional contact with Tipton provided it was in a manner that would not disrupt the children's daily lives. Although some evidence supported that the children are reluctant to visit with Tipton, the trial court attributed that reluctance to Darlene's negative attitude toward Tipton and the pending court proceedings. As to the allegations that Tipton sexually abused CT, the trial court found no improper touching occurred with Tipton's helping CT to wipe after using the bathroom. In his brief to this Court, Tipton likewise demonstrated that the trial court considered the evidence in

20

light of all relevant factors by pairing the *Walker* factors and the trial court's findings which supported a decision in his favor. We agree that despite not citing *Walker*,[12] the trial court's order sufficiently addressed relevant factors.

The Mortons acknowledge that the Court of Appeals analyzed the *Walker* factors but argue that the Court of Appeals erred by failing to consider fully the evidence introduced at the final hearing. By listing the factors and evidence viewed as disfavoring the award of visitation under those factors, such as the social worker and therapist's recommendation against visitation or for limited visitation with Tipton, the Mortons seek to persuade us of the trial court's error. Indeed, the conflicting evidence in this case would have allowed another decision maker to reach a different conclusion. However, if the trial court's findings of fact are not clearly erroneous, we assess whether the trial court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003); *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). We find no clear error in the factual findings and conclude that the trial court did not abuse its discretion in granting Tipton limited visitation three times per year.

We note that this case was initiated in Montgomery Circuit Court in October 2012. As concerns for the children evolved, so did the trial court's

___

[12] The appellant in *Massie v. Navy* also complained that the trial court did not cite *Walker* and perform a factorial analysis. Justice VanMeter, then the dissenting judge on the Court of Appeals' panel, counseled trial courts that they should cite *Walker* and list and consider all the enumerated best interest factors in their orders. 2014-CA-001052-ME, at 9 (Ky. App. Aug. 14, 2015). We reiterate that suggestion here.

21

attempts to find solutions which were in the best interest of the children. After conducting the final hearing and finding it to be in CT and KT's best interest to visit with Tipton, the trial court found yet another safeguarded avenue for CT and KT to have an opportunity to benefit from a relationship with their paternal grandfather and other paternal family members. The trial court structured restricted visitation at Tipton's daughter's home three times a year. Although this is far from the visitation requested by Tipton, the schedule will keep Tipton and his granddaughters from being complete strangers and will allow CT and KT to decide when they are older how their relationships with the paternal side of their family will develop. The Court of Appeals properly concluded that the trial court's findings were not clearly erroneous and that court did not abuse its discretion in this difficult case.

## CONCLUSION

In summary, Tipton petitioned to modify the court-ordered grandparent visitation by asking for an established visitation schedule. Over the course of time, the Mortons came to reject any visitation between Tipton and the grandchildren. The trial court finally granted visitation three times per year with restrictions. We conclude the trial court properly used the preponderance of the evidence burden of proof when assessing whether Tipton's grandparent visitation was in the best interest of the children and did not abuse its

discretion when granting the restricted visitation. The Court of Appeals is therefore affirmed.

Minton, C.J.; Keller, Lambert, VanMeter and Wright, JJ., sitting. All concur.

COUNSEL FOR APPELLANT:

John Maurice Henricks
ROWADY HENDRICKS LAW, P.S.C.

COUNSEL FOR APPELLEE:

Monica Lacy
MONICA S. LACY PSC