RENDERED: MAY 13, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0580-ME

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES

APPELLANT

v.

APPEAL FROM BOYD CIRCUIT COURT
HONORABLE JOHN F. VINCENT, JUDGE
ACTION NO. 20-CI-00826

LATANYA BATIE; ARNOLD BATIE,
IV; MEAHGAN GAIL RUSSELL;
AND JAMES WILLIAMS

APPELLEES

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: ACREE, GOODWINE, AND L. THOMPSON, JUDGES.

ACREE, JUDGE: The Cabinet for Health and Family Services appeals the Boyd

Circuit Court order granting custody of minor children, S.W. and P.W., to Latanya

Batie and Arnold Batie, IV (Grandmother and Uncle, respectively; jointly, the

Baties). Because the Baties lacked standing to pursue custody, the custody order entered by the court is voidable. The circuit court's *sua sponte* use of equitable estoppel to disallow the Cabinet's lack-of-standing defense was an abuse of discretion and its application was erroneous as a matter of law. We reverse and remand with instructions.

## FACTS AND PROCEDURE

Late on a Monday night, November 11, 2019, 34-year-old Meahgan Russell (Mother) gave birth to twins, a boy and a girl, in Ashland, Kentucky.[1] The twins were born addicted to drugs and would spend the next month in the hospital's neonatal intensive care unit (NICU) recovering from their addiction. Unsurprisingly, the Cabinet became involved.

The day after the twins were born, a Cabinet investigating supervisor interviewed Mother and archived a summary of her report in the twins' medical records. Notable in the initial report is Mother's admission she is a drug addict, that she has no interest in a program designed to promote infant and toddler health (Help Me Grow), that she is homeless and relies on her mother and the Salvation Army, and that she has two sons (ages 17 and 10) and a daughter (age 2) but has custody of none of them. The report makes no mention of the twins' father. The

---

[1] The record indicates Mother and Father were both Ohio residents, but without a permanent abode.

-2-

Cabinet investigating supervisor made an initial referral of the twins' cases to the Lawrence County office of the Cabinet's Department for Community Based Services (DCBS).

In the afternoon of November 13, 2019, Mother visited her children in the NICU, and visited them again, twice, the next day. Two days later, November 15, 2019, the Cabinet transferred the case to Boyd County DCBS and assigned it to Cabinet worker Amber King. The hospital discharged Mother the same day.

On November 21, 2019, around 5:00 PM, the on-duty nurse noted in medical records: "Mother and father visits[.]" The father is Appellee James Williams (Father). This is the only time he saw the twins. While visiting, he had someone photograph him with his youngest children. More than half a year later he shared the picture with his own mother, Grandmother, who then shared it with Uncle, Father's half-brother.

On the same day, November 21, 2019, Cabinet representatives filed petitions in Boyd District Court pursuant to the dependency, neglect, or abuse (DNA) statutes, specifically KRS[2] 620.060, and the Cabinet was granted

---

[2] Kentucky Revised Statutes.

emergency custody.[3]  The petitions named Mother and Father as biological and custodial parents.

The next day, November 22, 2019, Amber King of Boyd County DCBS met with Mother and discussed the hospital discharge plan for the twins. King would manage the twins' cases through their discharge.  King and Mother discussed Mother's inability to care for the children and the possibility of placement upon discharge with appropriate and qualified relatives.  However, Mother said she knew of no relative who would be satisfactory.  Consequently, the plan became placement in "foster care with Troy and Amanda Byrd . . . when medically stable."

By November 25, 2019, the Cabinet determined that, for some reason not disclosed by the record, the twins could not be placed with the Byrds, and the plan was changed to foster placement with Misty Burchett in Red Bush, Kentucky.

On November 26, 2019, the district court conducted a temporary removal hearing in accordance with KRS 620.080(1)(a) and Mother attended. Father did not attend.  The district court entered an order granting the Cabinet's motion that it be awarded temporary custody pursuant to KRS 620.090(1).  The

---

[3] *In re: P.W.*, No. 19-J-00196-001 (Boyd Dist. Ct., Nov. 21, 2019); *In re: S.W.*, No. 19-J-00197-001 (Boyd Dist. Ct., Nov. 21, 2019).

-4-

order also required drug screening for Mother and Father and set a pre-trial conference hearing for December 17, 2019.

On December 4, 2019, in accordance with KRS 620.180(2)(a)1. and prior to the pre-trial conference, the Cabinet convened a case planning conference. Mother attended; Father did not. Cabinet workers again asked Mother about relatives who might be willing to take temporary custody of the twins. She again said she knew of no one appropriate and claimed not to know Father's whereabouts.[4] Thereafter, Mother had no further contact with the Cabinet.

On December 11, 2019, Mother's twin daughter was discharged from the hospital and her twin son was discharged on December 13, 2019. Both were placed by the Cabinet with Misty Burchett who picked them up at the hospital.

At the December 17, 2019 pre-trial conference, in accordance with KRS 620.100(1)(a), the district court appointed counsel for each twin. Counsel was also appointed for Mother and Father; however, neither Mother nor Father participated in the court proceedings in district court from the time of the pre-trial conference. The district court also ordered that the twins remain in the Cabinet's temporary custody under the November 26, 2019 order, and that the twins' medical

---

[4] The initial investigating supervisor said in testimony that, although Mother did not identify any of Father's relatives by name, she did say "Father was out of state and, I think she said, possibly [in] Michigan."

records be filed in the record. Finally, January 28, 2020 was set as the date to adjudicate the Cabinet's claim that the twins were neglected.

At that adjudication hearing, the district court entered an order finding Mother and Father neglected the twins by abandonment and continuing the Cabinet's temporary custody of the twins under the November 26, 2019 order. Finally, the court set March 10, 2020 as the date for a disposition hearing.

Cabinet workers prepared a dispositional report on March 4, 2020, which the district judge reviewed the following day. Although the report said Mother and Father were "not being compliant with their case plans[,]" the Cabinet's initial "recommended permanency goal" remained "Return [the twins] to Parent." *See* 922 KAR[5] 1:140 § 4(2)(a) ("A permanency goal shall include one (1) of the following: (a) Return to parent . . . .").

Although the parents could not then be located, the Cabinet stuck to its permanency goal of reunification. Even so, the twins still would need to be "placed" once the disposition order ended the Cabinet's temporary custody in favor of the required order of commitment to the Cabinet as it pursued a permanency goal. Because "[n]o relatives were given [by Mother or Father] for placement of the children[,]" and "[n]o suitable family could be found" by the Cabinet's

---

[5] Kentucky Administrative Regulations.

independent efforts, "the children were placed in the least restrictive placement [available], which was foster care in a DCBS home in Louisa." Of course, the twins had been placed in foster care with Misty Burchett since their discharge in mid-December 2019. And although the Cabinet's dispositional report prepared on March 4, 2020 kept its permanency goal as "Return to parent," the Cabinet changed the placement to Chris and Heather Wilson of Louisa, "an approved foster-to-adopt home."

According to testimony and by federal requirement, many foster placements are part of concurrent planning that allows the Cabinet to pursue family reunification while providing a "back-up" plan for the possibility of adoption by the foster family. *See* 922 KAR 1:140 §1(6) ("'Concurrent planning' means the cabinet simultaneously plans for: (a) The return of a child in the custody of the cabinet to the child's parent; and (b) Another permanency goal for the child if return to parent is not achieved within fifteen (15) of the last twenty two (22) months, in accordance with 42 U.S.C.[6] 675(5)(E)."). However, the foster parents did not perceive the twins' placement with them to be only a part of the Cabinet's concurrent planning. Chris Wilson's affidavit expresses his position that "[f]rom the first text [from the Cabinet], this was never foster care, this was adoption."

---

[6] United States Code.

The Baties claimed throughout this case that Cabinet workers planned for the Wilsons to adopt the twins early on. They assert this alleged plan was the reason the Cabinet failed to engage in diligent efforts to find relatives, which they also claim would have led to their much earlier pursuit of placement and custody.

However, the Cabinet's stated permanency goal of "return to parent" belies that conclusion. Furthermore, subsequent actions by the Cabinet undermine that claim, especially when we consider the Cabinet did not immediately abandon "return to parent" as its permanency goal even when the district court rejected it.

The district court disagreed with the Cabinet's stated recommendation that the initial permanency goal for the twins be reunification. Instead, "over ob[jection of] parents' attys[,]" the March 10, 2020 disposition order states: "Initial Goal shall be TPR [termination of parental rights]/Adoption due to abandonment[.]" The court also ruled "[t]here are no less restrictive alternatives" available because "parents abandoned" the children, and "[r]easonable efforts were made to prevent the [twins'] removal from the home[.]"[7]

---

[7] This part of the order may have seemed ambiguous to Cabinet workers at the time because it did not waive the Cabinet's obligations to pursue reasonable efforts. *See* KRS 610.127. Another indicator the district court did not expect the Cabinet to stop its "reasonable efforts" is the fact that it did not set a permanency hearing within thirty (30) days as required by KRS 610.125(2) when "reasonable efforts" are waived. Instead, the court set a 6-month permanency plan review hearing for September 22, 2020. In any event, the Cabinet continued looking for Mother and Father and searching for relatives after the March 10, 2020 order, an indication Mother's and Father's case workers did not perceive the order to have absolved the Cabinet of its responsibility to continue pursuing reunification.

Importantly, the disposition order ended the period of the Cabinet's temporary custody and began the period of commitment to the Cabinet for placement of the twins pursuant to KRS Chapter 620. *See, e.g.*, KRS 620.363(7) (child entitled to "[p]lacement in the least restrictive setting . . . to the extent that such placement is available"). As discussed below, this order compelled the Cabinet to pursue concurrent planning to reunify the family while moving forward with the district court's order of TPR and adoption; *i.e.*, "[c]oncurrent planning." 922 KAR 1:140 §1(6).

The disposition order's entry signaled the Cabinet to "file a case permanency plan . . . no later than thirty (30) days after the effective date of the order." KRS 620.230(1). A case permanency plan is comprehensive. Relevant here, the Cabinet needed to prepare a plan that included the reasons the Cabinet was granted custody and the actions it proposes over the next six (6) months to assure that while a permanency goal is pursued, the contemplated placement for the children minimizes harm. *See* KRS 620.230(2). The district court set a "6 Month Permanency Progress Review (PPR)" hearing for September 22, 2020.

The record shows the Cabinet intensified documenting its own proposed permanency goal of reunification, as well as the goal ordered by the district court of parental rights termination and adoption. In the same month the disposition order was entered, March 2020, the ongoing case worker assigned in

December 2019, Tina Hammond, received a communication from a child protective services worker in Ohio who was working with Mother and Father to place their three-year-old daughter with the Baties in Michigan.[8] That is when Hammond learned Mother and Father were residing in a motel in Ironton, Ohio, but the Ohio worker provided no other contact information for the parents, or for Grandmother or Uncle.

In March 2020, Hammond also learned the Cabinet's protocol of a prompt LexisNexis internet search for relatives was never conducted.[9] Normally, such a search occurs within ten (10) days of the first case plan, which was created on December 5, 2019, shortly before Hammond was assigned as the ongoing case worker. In fact, such diligence in identifying relatives is a requirement of federal law.[10] No one in the Cabinet could explain the delay when asked.

---

[8] The record does not reveal whether the communication was before or after March 10, 2020, the date of the dispositional hearing.

[9] The record also fails to indicate when in March 2020 this discovery occurred.

[10] Federal law requires Kentucky's legislative plan for foster care and adoption to:

> provide[] that, within 30 days after the removal of a child from the custody of the parent or parents of the child, the State shall exercise due diligence to identify and provide notice to the following relatives: all adult grandparents, all parents of a sibling of the child, where such parent has legal custody of such sibling, and other adult relatives of the child (including any other adult relatives suggested by the parents), subject to exceptions due to family or domestic violence, that –

Hammond testified that when she discovered no LexisNexis search had been conducted, "I took it upon myself" to initiate one. On March 11, 2020, the day after the district court entered the disposition order, Hammond received the search results. It identified several relatives but not Grandmother or Uncle who were identified only as "associates" of Father.[11] Hammond then sent form letters to the identified relatives, but none responded with a willingness to take in the twins. For reasons of confidentiality and as a matter of protocol, letters were not sent to persons identified as associates; consequently, no letters were sent to Grandmother or Uncle.

As noted, the Cabinet pursued concurrent planning for the twins. Although the district court ruled the parents had abandoned the twins and ordered the Cabinet to terminate Mother's and Father's parental rights (requiring a separate

**(A)** specifies that the child has been or is being removed from the custody of the parent or parents of the child;

**(B)** explains the options the relative has under Federal, State, and local law to participate in the care and placement of the child, including any options that may be lost by failing to respond to the notice . . . .

42 U.S.C. § 671(a)(29).

[11] The domestic relations commissioner who heard the evidence in the instant circuit court action supposed the reason was that after Grandmother remarried, she and Father no longer shared the same name. The district judge commented on the imperfect nature of this particular internet search.

legal proceeding in circuit court), the legislative scheme imposes a duty upon the Cabinet, an executive branch agency, and not the judiciary, to make its own determination as to when all reasonable efforts toward reunification have been exhausted. *See* KRS 625.090(3)(c) (Cabinet must show it "made reasonable efforts . . . to reunite the child with the parents"); KRS 620.020(13) (defining "[r]easonable efforts" as requiring Cabinet's "ordinary diligence and care . . . to utilize all preventive and reunification services available"). The statutory duty regarding TPR actions under "KRS 625.090(3)(c) focuses only on the Cabinet's efforts prior to the TPR petition, *irrespective of the permanency goals*" such as the district court ordered in this case. *Cabinet for Health and Fam. Servs. v. K.H.*, 423 S.W.3d 204, 213 (Ky. 2014) (emphasis added). With its duty in mind, the Cabinet continued its search to locate Mother and Father consistent with its initial "recommended permanency goal" for the twins of "Return to Parent" – a goal that did not change within the Cabinet for a few months after disposition.

Furthermore, even after a disposition order is entered, if the Cabinet can succeed in securing a relative placement, the Cabinet is required to "request an exception for proceeding with involuntary termination of parental rights[.]" 922 KAR 1:140 § 6(2)(a). Consistent with that possibility in this case, the Cabinet continued to search for relatives, even after the district court's disposition order for

the Cabinet to initiate TPR actions. Testimony revealed that as of May 2020, the Cabinet's efforts still included locating nonparent relatives.

Despite such efforts, the Cabinet had to comply with the district court's order. Hammond compiled a "TPR packet" for Cabinet attorneys to prosecute TPR actions that would soon be filed. But Father's casual act of finally telling Grandmother about the twins would change the entire trajectory of this case.

On June 28, 2020, Father sent Grandmother the picture of himself with the twins taken more than seven months earlier. She shared it with Uncle, and both mistakenly believed it to be a relatively recent photo. Then, in July 2020, Mother and Father were arrested in their hotel room in Ironton, Ohio, for trafficking in fentanyl. On July 30, 2020, the Cabinet initiated TPR actions against Mother and Father, but the cases never proceeded to a conclusion.

When the Baties learned Mother and Father were arrested, they reached out to various child protective services agencies in Ohio and Kentucky to locate the twins and pursue custody, in the same manner they worked with the Ohio child protective services office for custody of the twins' three-year-old sister. Their work with Ohio authorities familiarized them with the placement and adoption process across state lines, including the home assessment procedure under

the Interstate Compact on the Placement of Children (ICPC);[12] they were prepared to do the same with Kentucky authorities. After many tries, Uncle finally contacted Hammond who testified that Uncle called her at "the beginning of September."

According to Hammond's testimony, Uncle said Father told him and Grandmother the twins were in foster care, leading to their belief foster care was recent and a consequence of Father's incarceration. Uncle told Hammond he and Grandmother desired custody of the twins. Hammond took down all his contact information, including his social security number, and the same contact information for Grandmother. Hammond said she told Uncle that "whenever we get towards the one-year mark, that that's when we look at the goal being changed to adoption and looking at permanency" which would be two months later, in November 2020. Though this statement would be true in most cases, it was inaccurate here because the district court changed the permanency goal in its March 10, 2020 disposition order and, in May 2020, the Cabinet's goal also "changed to adoption."[13]

---

[12] The Interstate Compact on the Placement of Children is codified in Ohio as Ohio Rev. Code Ann. § 5103.20 *et seq.*, and in Kentucky as KRS 615.030 *et seq.*

[13] On or about June 8, the Case Review Board filed findings and recommendations indicating May 18, 2020 was the date the Cabinet changed its permanency goal to coincide with the disposition order.

When Hammond's supervisor, Robin Mautz, spoke with Grandmother later in September, she confirmed the permanency goal was changed to adoption already, that the twins were with a good foster family, and that "it would be in the best interests of the children not to change placement at this time, given their attachment and the length of time they had been in these foster parents' care."

Notwithstanding the Baties' contacts with the Cabinet, the DNA cases proceeded as scheduled. On September 22, 2020, the district court conducted the permanency progress review hearing. Hammond recommended "that the children remain committed to the custody of the Cabinet with the current goal of adoption in their current placement [with the foster-to-adoption family, the Wilsons], and that reasonable efforts [to reunify with parents] be waived" pursuant to KRS 610.127.[14] She also testified that she did not inform the district court that Uncle had contacted her, and did not tell the court that Uncle and Grandmother "wanted to have custody or placement of these children." The reason for not informing the district court, she said, was that "the goal was changed . . . to adoption."

At the September 22, 2020 hearing, the district court entered an order continuing the twins' commitment to the Cabinet with continued placement with

---

[14] The court appointed special advocate supervisor, Jessica Sexton, presumably thought the Cabinet was still working under its initial permanency goal of reunification because her recommendation was "a goal *change* to adoption in [the] current placement, and that reasonable efforts be waived." (Emphasis added.)

the Wilsons and with the same goal of TPR and adoption. The order expressly "waive[d] reas[onable] efforts" which, pursuant to KRS 610.127, relieved the Cabinet of its statutory duty to continue pursuing reunification with Mother and Father. Finally, the district court set a permanency hearing for November 17, 2020, as required by KRS 610.125(1) ("District Court shall conduct a permanency hearing no later than twelve (12) months after the date the child is considered to have entered foster care[.]").

In the meantime, the Baties hired legal counsel. On October 29, 2020, their counsel entered her appearance in the district court's DNA actions but did not immediately pursue intervention or custody in that forum. The district court conducted the November 2020 permanency hearing as scheduled and ordered that the twins remain committed to the Cabinet with a permanency goal of adoption. Another permanency hearing was scheduled for November 16, 2021. But the district court also noted in its record that the Baties had initiated a custody petition in Boyd Circuit Court and that it would defer to that court's decision. When the Baties sought custody in the DNA actions, the district court again noted the pending circuit court custody action they filed and deferred decision-making to what it called the Boyd Circuit Court's "superior jurisdiction."

The Baties' counsel filed their custody petition in circuit court the same day she entered her appearance in the DNA actions. Besides seeking

custody, the petition states "[t]hat the Petitioners are more than willing to participate in the ICPC process with respect to the minor children"; *i.e.*, a home assessment. The "ICPC process" recognizes that children of parents deemed unsuited to the responsibility of their custody might best be placed with a person, often a relative, who does not live in the state. Generally, it seeks to "maxim[ize the] opportunity [of a child] to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care." KRS 615.030, Art. I (a).

More specifically, the ICPC allows that: (1) the state where the child might be placed will "have full opportunity to ascertain the circumstances of the proposed placement" by conducting a home study; (2) the state having initial jurisdiction of the child and pursuing placement out of state may "obtain the most complete information on the basis of which to evaluate a projected placement before it is made"; and, finally, ongoing "[a]ppropriate jurisdictional arrangements for the care of children will be promoted." KRS 615.030, Art. I (b), (c), and (d).

The Cabinet's response denied the Baties were fit and proper persons to have custody of the twins and further denied it is in the best interests of the twins to reside permanently with them. Significantly, the Cabinet asserted the affirmative defense that the petitioners lacked standing to pursue custody.

The circuit court referred the matter to its domestic relations commissioner (DRC) for a hearing on the Baties' motion for temporary custody. On January 27, 2021, the DRC conducted a virtual hearing in accordance with Court of Justice administrative orders relating to COVID-19. The question was whether the Baties should be awarded temporary custody of the twins. The guardian *ad litem* (GAL) for the children and the GALs for the biological parents recommended placements with the Baties as being in the best interest of the twins. The Cabinet challenged this, again believing the stability of the twins' lives should not be lost by placing them with new caregivers. After concluding the hearing, the DRC prepared proposed findings and conclusions, and recommended the Baties' petition for custody of the twins be granted.

The Cabinet filed exceptions, most notably challenging Uncle's and Grandmother's standing to initiate an original custody action. On April 19, 2021, the circuit court heard arguments of counsel. Considerable heat was generated about whether this was "an egregious case of the [C]abinet workers failing to meet their obligation to a family and to these children."

When all counsel had their say, the circuit court addressed them from the bench. The court recognized the good intentions and suitability both of the Baties and of the foster family. The court further acknowledged the challenging nature of the Cabinet's work, and that of its workers, stating:

-18-

The [circuit] court has had numerous cases with the Cabinet . . . and is convinced beyond all doubt that the Cabinet, as a whole, does the best for the children of our community . . . .

But the court expressed concern about the Cabinet's efforts in this case, stating,

These are perplexing circumstances that we find ourselves in. It appears to the court that the reason that the petitioners [the Baties] were not discovered earlier was this LexisNexis report – although there is evidence that Ohio [child protective services] made the Cabinet aware of the petitioners.

. . . .

We've got, obviously, a loving group of petitioners who have already taken in two children who are the siblings of these children and . . . , if we're looking at the overall purpose of what the state should be doing in these matters, it's to keep families together.

The court noted there have been "outstanding foster parents . . . [who] lost the child that they were caring for because of the rehabilitation of the parent." The rationale there was reunification of the family, and that rationale motivated the court to award custody to the only parties involved who were related to the twins.

I don't doubt the sincerity of the foster parents or the officials of the Cabinet for doing what *they* think is best for the child[ren]. But I think the overreaching [*sic*; perhaps "overarching"] obligation of this Commonwealth is to keep families together wherever possible. And that's the basis upon which I'm going to uphold the [domestic relations] commissioner's report because I believe you've got a caring [G]randmother and a caring [U]ncle who now live together . . . . But even more importantly than just that

-19-

is they have two [siblings] of these twins and I think those
twins should be able to grow up in their family unit.

(Emphasis expressed by the circuit court.)

However, courts speak through their written orders. Immediately after the hearing, without fanfare or elaboration, the circuit court entered an order stating only that the report of the DRC's findings, conclusions of law, and recommendations are "hereby adopted and confirmed as an ORDER of this COURT." Thus, the circuit court's order regarding the Cabinet's challenge to Grandmother's and Uncle's standing was what the DRC had expressed: "the issue at this point is not one of standing, [but] . . . ultimately what is in the best interest of the children."

Two days later, on April 21, 2021, the Cabinet filed motions seeking the circuit court's order specifically addressing standing.[15] Two days after that, the circuit court entered a twelve-page order addressing all pending motions.

The court placed blame squarely on the Cabinet for the circumstances the circuit court was compelled to address. Quoting *J.L.C. v. Cabinet for Health and Family Services*, the court concluded that, "immediately following removal of a child, the Cabinet is clearly mandated to consider placement with relatives that

---

[15] The Cabinet filed several other motions, not relevant here, designed to maintain the status quo so the twins would remain with the foster parents who sought unsuccessfully to intervene.

-20-

are known and are qualified." 539 S.W.3d 692, 695 (Ky. App. 2018). Then, quoting *Baker v. Webb*, the court said, "Here, the Cabinet completely failed to follow its own policies and procedures by not initiating a home study of [the Baties]." 127 S.W.3d 622, 625 (Ky. 2004). Faulting the Cabinet for not more quickly identifying the Baties as relatives, the circuit court said "the delay is impossible to explain . . . ." The court noted "that the Ohio Cabinet advised the Kentucky Cabinet that it was placing another child of [the twins' father] with these same Petitioners."

Responding to the Cabinet's claim that the Baties lacked standing, the circuit court deemed the Cabinet's conduct in violation of KRS 620.090 and 922 KAR 1:140, its own regulation preferring relative placement.[16] It concluded such conduct "constitute[s] exceptional and extraordinary circumstances and the equities involved in this case are such that it is applicable [*sic*; perhaps "appropriate"] to apply estoppel against the Cabinet." Though the Baties never raised or asserted an equitable estoppel argument to defeat the lack-of-standing defense, the circuit court applied it *sua sponte*.

---

[16] Notably, the current version of 922 KAR 1:140 makes no reference to "least restrictive placement." Furthermore, although the regulation notes that it "relates to" KRS 620.090, that statute is no longer otherwise referenced in this regulation. The circuit court was obviously referring to the 2004 version of the regulation that was in effect when the Kentucky Supreme Court cited the regulation in *Baker*, 127 S.W.3d at 625.

Furthermore, the court eventually also concluded the Baties did have standing to petition for custody, stating:

> In the adoption setting, a relative under KRS 622.090 [*sic*; KRS 620.090] had a specific right of intervention. <u>Baker v. Webb</u>, 172 [*sic*; 127] S.W.3d 622 (Ky. 2004). No less should be granted Petitioners here. "Here[,] the Cabinet completely failed to follow its own policies and procedures." <u>Id.</u> at 625. The Court found the regulations and policies of the Cabinet "grant a significant legal interest" under the Intervention Rule [CR[17] 24.01], and the [Boyd Circuit] Court believes this applicable to standing as well.

(Record (R.) 188.)

After concluding the Baties had standing, the circuit court applied the best-interests analysis to substantiate its prior ruling when adopting the DRC's recommendation that custody should be granted to the Baties.

Finally, the circuit court addressed the Baties' motion, supported by the twins' father, to have the Cabinet immediately deliver the twins to them, with law enforcement assistance if necessary. The circuit court stated:

> [It] is not unmindful of the situation of changing homes on such young children. The Court directs the Petitioners to meet the children with a counselor of the Cabinet present, together with the foster parents at a time and place, before noon on April 24, 2021, to be agreed between the parties to transfer the children.

---

[17] Kentucky Rules of Civil Procedure.

(R. 190.)

When the district court learned of the circuit court decision, it determined that "perm[anency was] achieved by Cir. Ct. assuming juris[diction] over child[ren] & issuing custody order." The DNA cases were stricken from the district court docket, with "leave to redocket if remanded."

The Cabinet now appeals the circuit court's order, seeking the specific relief that "this matter be remanded to the Boyd Circuit Court with directions that the [Baties'] petition be dismissed due to lack of standing."

## STANDARD OF REVIEW

Because the question of standing is "an issue of law, we review *de novo*." *Tax Ease Lien Investments 1, LLC v. Commonwealth Bank & Tr.*, 384 S.W.3d 141, 143 (Ky. 2012) (citation omitted). A different standard applies to the circuit court's equitable estoppel holding which involves questions of fact and law.

We will set aside a circuit court's factfinding only if clearly erroneous. *Lawson v. Loid*, 896 S.W.2d 1, 3 (Ky. 1995); CR 52.01. But we review the court's application of law *de novo*, without deference to the circuit court. *Cummings v. Commonwealth*, 226 S.W.3d 62, 65 (Ky. 2007). This two-step standard applies when reviewing a circuit court's equitable estoppel decision. *Weiand v. Bd. of Trustees of Kentucky Ret. Sys.*, 25 S.W.3d 88, 92 (Ky. 2000).

-23-

## ANALYSIS – LACK OF STANDING

The Cabinet's timely raised lack-of-standing defense did not persuade the circuit court to dismiss the Baties' custody petition. The first of two ways the circuit court found that defense unavailing was by analogy to the Supreme Court's analysis of KRS 620.090(2) in *Baker v. Webb*, *supra*, thereby concluding, in effect, that the Baties had statutory standing. *See Kenton County Board of Adjustment v. Meitzen*, 607 S.W.3d 586, 597 (Ky. 2020) (describing statutory standing). Later in this Opinion, we will address the second of the two ways – equitably estopping the Cabinet from asserting the defense. For now, *Baker* is our starting point.

To begin, *Baker* does not analyze the same question presented in this appeal – whether a nonparent relative who is neither a *de facto* custodian, KRS 403.270(1), nor a person acting as a parent, KRS 403.800(13), has standing to sue for a child's custody based on the relationship alone. As we discuss below, *Baker* presented an unusual set of facts which the Supreme Court concluded required the circuit court to grant its appellants' intervention in their second cousin's pending adoption action. *Baker*, 127 S.W.3d at 623. Because "standing and intervention are two distinct concepts," *A.H. v. W.R.L.*, 482 S.W.3d 372, 374 (Ky. 2016), *Baker* is distinguishable on its face.

However, we conclude the legal distinction between standing and intervention is not the primary reason the circuit court erred in relying on *Baker*.

Although the Baties base their claim of standing on the same statute found to be decisive in *Baker*, KRS 620.090(2), the meaningful distinction between that case and this is not legal, but factual. The Baties cannot assert the same facts the second cousins proved in *Baker* to establish their "interest relating to the . . . transaction" of the adoption. CR 24.01(1)(b).

For this analysis only, we set aside consideration of the legal distinction between standing and intervention and focus on the "interest" the Baties claim supports both intervention in *Baker* and standing here. We first examine the statutory source of the interest *Baker* identifies; then, we identify the factual distinctions that make *Baker* inapposite in this case.

*Relative placement preference under an order of temporary custody*

In deciding *Baker*, the Supreme Court came to "believe that the policies"[18] behind the Cabinet's role in Kentucky's broken families give rise to an

_____

[18] Generally, those policies are expressed in the Unified Juvenile Code as "promoting . . . protection and care of children[.]" KRS 600.010(2)(a). The policy of KRS Chapter 620 addressing dependent, neglected, or abused children more specifically focuses on protecting the best interests of children. The statute defining the chapter's purpose says:

> *Children have certain fundamental rights* which must be protected and preserved, including but not limited to, the rights to adequate food, clothing and shelter; the right to be free from physical, sexual or emotional injury or exploitation; the right to develop physically, mentally, and emotionally to their potential; and the right to educational instruction and the right to a secure, stable family. It is further recognized that upon some occasions, in order to protect and preserve the *rights and needs of children*, it is necessary to remove a child from his or her parents.

KRS 620.010 (emphasis added). Notwithstanding this legislative policy focus on children's interests, the Supreme Court said the legislation also identifies an "interest relating to the . . .

interest the appellants could claim as grounds to intervene in their cousin's adoption case. *Baker*, 127 S.W.3d at 625. The Baties argue by analogy that the same policies and same interest support their claim of standing. However, the interest identified in *Baker* is not the right of relatives, simply because they are relatives, to adopt. *Id.* ("Appellants do not have a superior right to adopt."). Similarly, the interest identified in *Baker* does not support the Baties' right to claim custody of the twins simply because they are related.

Rather, the identified interest is the right of known relatives to be "*evaluated for relative placement*, as mandated by [the Cabinet's] own policies and regulations," after which the Cabinet can "make an informed recommendation to the circuit court as to the *best placement* option for the child" during the temporary removal phase. *Id.* at 626 (emphasis added). This advances the policies of KRS Chapter 620 consistent with the child's statutory rights. *See* KRS 620.363(7) ("child . . . shall have the following rights to . . . [p]lacement in the least restrictive setting"); 922 KAR 1:140 § 3(3)(a)1 (2004) ("[p]lacement shall be [s]elected according to the least restrictive appropriate placement available, as required by KRS 620.090(2) . . . .").

---

transaction" that can be claimed by nonparent relatives who establish the right facts. *Baker*, 127 S.W.3d at 624 (quoting CR 24.01(1)(b)).

*Baker* shows clearly enough that the Supreme Court did not read the statute more broadly than to identify the need for timely protection of the child's interest in having known relatives evaluated and preferred as the placement most likely to be the least restrictive setting for the child while permanency goals are pursued. Citing the same authority as the circuit court in the instant case[19] – KRS 620.090(2) and 922 KAR 1:140 (2004) – the Supreme Court said:

> [T]he policies and administrative regulations of the Cabinet that give priority to relatives of a child *placed* for adoption, . . . vest Appellants with a sufficient, cognizable legal interest in the adoption proceeding of this child.

*Baker*, 127 S.W.3d at 625 (emphasis added). We emphasize the words "placed" and "placement" because KRS 620.090 addresses only the Cabinet's placement of a child while it has custody pursuant to a temporary custody order authorized by that statute. Of course, the Supreme Court did not misread KRS 620.090(2) as directing the Cabinet to prefer relative placement generally and interminably, but recognized the statute specifically requires preferential consideration of relatives only when "*placing* a child under an *order of temporary custody . . . .*" *Baker*, 127 S.W.3d at 625 (quoting KRS 620.090(2) (emphasis added)). This language effectively delineates the duration of the Cabinet's obligation to prefer appropriate relative placement as coterminous with its order of temporary custody. *See* LOUISE

---

[19] *See supra* n.15.

EVERETT GRAHAM & JAMES E. KELLER, 16 KY. PRAC. SERIES, DOMESTIC RELATIONS L., *Adoption – Who may adopt and be adopted* § 26:2 (2021) ("When a child is removed from his or her home in an emergency, a temporary custody order under KRS 620.090(2), the statute relied upon by the Supreme Court, is good for only forty-five days, . . . . [T]he statute cited by the court requires consideration [of preferred relative placement] only in the temporary removal context.").

To understand why the second cousins in *Baker* established their interest and why the Baties cannot, we must compare the facts of the former case with those of the current one.

*Facts needed to establish interest sufficient to intervene of right in* Baker

"The facts of [*Baker* were] somewhat disputed and very little is in the record[,]" *Baker*, 127 S.W.3d at 623, and that might lead the casual reader to miss an important circumstance plainly on the face of the opinion – the DNA action was prosecuted in Warren District Court and the subsequent adoption action was filed in the Edmonson Circuit Court. *Id.* The opinion does not indicate that either court knew the other action was proceeding. Another subtle fact that plays significantly in *Baker* is that little time passed from the date the child was removed from parental custody in Warren County to the date the relatives tried to intercede in the Edmonson County adoption. As the opinion states:

> [I]n late June 2001, the Warren District Court removed the
> minor child, then four years old, from the custody of his

father due to the biological father's arrest on pornography charges. The child was placed in the temporary custody of the Warren County Cabinet for Families and Children (hereinafter "Cabinet"), and the biological father committed suicide a few days later. On June 26, 2001, the child was placed in the Webb's [*sic*] foster home. Upon learning of the father's suicide, Appellants, who are second cousins to the child, contacted the Cabinet and expressed their interest in adopting the child. Appellants, who live in Ohio, contend that their first contact with the Cabinet occurred the day before the biological father's funeral. . . . Appellants eventually learned from outside sources that the mother's parental rights had been terminated and that the Webbs had filed an adoption action in the Edmonson Circuit Court.

*Id.*

Obviously, the Cabinet and the second cousins were communicating with each other within as little as one week, certainly no more than two weeks, after the child's removal by the Warren District Court's order of temporary custody. The unavoidable implication is that the Cabinet knew, while it had temporary custody of the child, that these relatives were willing to have the child placed with them. This was well before the Warren District Court conducted an adjudication hearing and disposition. The Cabinet was under the obligation of KRS 620.090 to determine whether those relatives qualified and, if so, to consider preferring them for placement. KRS 620.090(2). The Cabinet even told the cousins in June 2001 that Cabinet workers "would have to complete an adoptive

home study before the child could be placed in their home" but "[t]he Cabinet concede[d] that it did not initiate such actions." *Baker*, 127 S.W.3d at 623-24.

Unfortunately, the opinion does not tell us the date the adoption commenced in Edmonson Circuit Court or the date the second cousins moved to intervene. It does not tell us whether the Warren District Court's order of temporary custody was still in place when either event occurred. However, we can deduce that the temporary custody order was still in effect when the second cousins moved to intervene by considering the facts we do know in the context of the Supreme Court's ruling, as follows.

The final adoption hearing occurred in Edmonson Circuit Court less than seven (7) months after the child was removed by an order of the Warren District Court. *Id.* ("On June 26, 2001, the child was placed in the Webb's [*sic*] foster home. . . . [F]inal adoption hearing [was held] on January 14, 2002"). Although an order of temporary custody favoring the Cabinet is initially limited to forty-five (45) days, the Warren District Court was authorized to "extend such time . . . ." KRS 620.090(6). From such facts alone, we cannot eliminate the possibility that the second cousins' intervention motion in Edmonson Circuit Court preceded the termination of the Warren District Court's temporary custody order in the DNA action. However, the opinion itself makes that sequence of events almost certain.

-30-

When it comes to the sequence, *Baker* says little, but enough. The Supreme Court said KRS 620.090(2) provides the necessary interest. But the opinion casts that interest in a temporal context by finding more than that the second cousins had an interest. As CR 24.01 requires, said the Supreme Court, the second cousins' interest is "a '*present* substantial interest . . . .'" *Baker*, 127 S.W.3d at 624 (emphasis added) (quoting *Gayner v. Packaging Serv. Corp. of Ky.*, 636 S.W.2d 658, 659 (Ky. App. 1982)). If the temporary custody order under KRS 620.090(1) had been replaced by an order of commitment, the preference of KRS 620.090(2) no longer would have applied, and the interest the second cousins claimed would have lapsed – it would no longer be a *present* interest as the Supreme Court held, but a past interest.

It is not truly problematic that the sequence is not expressly stated in the opinion. Either the Supreme Court knew or justly concluded the second cousins moved to intervene in the Edmonson Circuit Court adoption before the Warren District Court replaced the temporary custody order with an order of commitment to the Cabinet. If that was not the sequence, it would refute the axiom that "justices are presumed to know the law[.]" *Burton v. Foster Wheeler Corp.*, 72 S.W.3d 925, 930 (Ky. 2002). To the contrary, it would suggest the Justices in the majority did not know the time limitation of KRS 620.090(2) or the *present-*interest requirement of CR 24.01. We know, however, that neither is so. Justice

Keller expressly identified the former point of law in his dissent, *Baker*, 127 S.W.3d at 629 (Keller, J., dissenting), and the majority opinion expressly states the latter point. *Id.* at 624.

To be clear, there is a substantive distinction between a temporary custody order and an order of commitment. A temporary custody order in favor of the Cabinet cannot last beyond the dispositional hearing. KRS 620.090(6) ("child shall remain in temporary custody with the cabinet for a period of time not to exceed forty-five (45) days . . . court may extend such time after making written findings establishing the need"); KRS 620.140(2) ("An order of temporary custody to the cabinet shall not be considered as a permissible dispositional alternative."). A commitment order, on the other hand, can remain effective until a child is twenty-one years old. KRS 620.140(1)(e) ("court may authorize commitment up to the age of twenty-one (21)"). The transition from a temporary custody order to an order of commitment brings to an end the relative placement preference of KRS 620.090(2). It is the demarcation between the pre-adjudication, temporary removal phase of a DNA action and the post-adjudication period of the child's commitment to the Cabinet. *See* KRS 620.140(1)(d) and (2) (showing dispositional alternative as "[c]ommitment of the child to the custody of the cabinet for placement for an indeterminate period of time . . . order of temporary custody to the cabinet shall not be considered as a permissible dispositional alternative"); KRS 620.180(2)(b)

(referencing regulations to address "children committed to the cabinet as dependent, neglected or abused and placed in foster family homes").

Therefore, we conclude the rule in *Baker* will find application when courts are faced with such unusual facts as found in that case. Then, the court can turn to *Baker* for the rule that intervention of right in an adoption is required upon proof the intervenor: (1) is known to the Cabinet, KRS 620.090(2); (2) is "a relative who has been denied consideration" for placement, *Baker*, 127 S.W.3d at 625; and (3) asserts the interest while the child is still subject to an order of temporary custody under KRS 620.090(1) – *i.e.*, before the "present" interest under KRS 620.090(2) lapses. *Baker*, 127 S.W.3d at 624.

*Baties do not allege facts necessary to claim interest identified in* Baker

Applying the rule in *Baker*, we conclude the Baties' interest under KRS 620.090(2), if it ever existed, lapsed before they filed their petition in circuit court. The Baties were not known to the Cabinet until long after the order of temporary custody was replaced by the order of commitment entered at the dispositional hearing. Furthermore, there is no reason to believe an earlier LexisNexis search would have made a difference. The search still would have identified the Baties as associates. There is no proof the Ohio workers identified the Baties specifically or gave the Kentucky Cabinet workers contact information but, if they did, the information was conveyed long after the temporary removal

-33-

phase and its corresponding relative placement preference ended. Therefore, the Baties could satisfy neither the first nor third parts of the *Baker* rule. At most, they could claim to be relatives not considered for placement by the Cabinet. That is not enough.

Unable even to assert the interest that permitted intervention in *Baker*, the Baties have no standing to claim the right to pursue custody of the twins.

## ANALYSIS – ESTOPPEL

As a sort of back-up plan to its ruling that the Baties had standing, the circuit court ruled the Cabinet was equitably estopped from asserting otherwise. We conclude the circuit court erred.

First, the Baties never asserted or argued the doctrine of equitable estoppel to overcome their lack of standing. The circuit court itself was first to raise the estoppel argument and did so only after the Cabinet pressed the court for a decision on its timely lack-of-standing defense. Estoppel, like lack of standing, is an affirmative defense that is waived if not raised by the party who would benefit. *See* CR 8.03. The Supreme Court held that because certain defensive arguments "may be waived, an appellate court errs by injecting [such defense] into a case on its own motion." *Harrison v. Leach*, 323 S.W.3d 702, 709 (Ky. 2010); *see also Bailey v. Bailey*, 231 S.W.3d 793, 800 (Ky. App. 2007) (where non-jurisdictional defense is not raised or argued by parties, it is error for trial court to raise it *sua*

*sponte*). We see no reason the *Harrison* ruling on this point should not apply equally here to the circuit court.[20] *See Bowling v. Ky. Dep't of Corrections*, 301 S.W.3d 478, 485 (Ky. 2009) (citing *Watts v. K, S & H*, 957 S.W.2d 233 (Ky. 1997)) ("failure to assert timely an affirmative defense waives that defense and precludes its consideration by the trial court"); *see also Givens v. Commonwealth*, 359 S.W.3d 454 (Ky. App. 2011) (party could not raise equitable estoppel on appeal where party did not raise equitable estoppel in the circuit court).

"[T]he judge should leave to the lawyers the development of the case and be cautious and circumspect in his participation and conduct . . . ." *Transit Authority of River City (TARC) v. Montgomery*, 836 S.W.2d 413, 416 (Ky. 1992). We conclude the circuit court erred by raising the estoppel defense to cure the Baties' lack of standing and subsequently finding its own argument persuasive.

Additionally, we are persuaded that if the Baties had timely raised the estoppel argument themselves, they still could not have prevailed. We agree with the Cabinet that the circuit court erred in its application of the doctrine.

---

[20] We note in some instances, equitable estoppel, even if waived, may be raised by the circuit court. Application of this exception appears to be limited to parties failing to adequately plead unjust enrichment. *See Rose v. Ackerson*, 374 S.W.3d 339, 343 (Ky. App. 2012) ("A party's failure to assert the existence of unjust enrichment does not serve to make it nonexistent."). Unjust enrichment falls under the umbrella of equitable estoppel. *Id.* This case is not one in which this exception could apply.

"Under the doctrine of equitable estoppel, certain conduct by a party is viewed as being so offensive that it precludes the party from later asserting a claim or defense that would otherwise be meritorious." *Akers v. Pike Cty. Bd. of Educ.*, 171 S.W.3d 740, 743 (Ky. 2005). It is a "defensive doctrine founded on the principles of fraud, under which one party is prevented from taking advantage of another party whom it has falsely induced to act in some injurious our [*sic*] detrimental way." *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 594-95 (Ky. 2012). The elements of equitable estoppel are:

> (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other person; and (3) knowledge, actual or constructive, of the real facts. And, broadly speaking, as related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*City of Richmond v. Spangler Apts., LLC*, 547 S.W.3d 556, 562 (Ky. App. 2018) (quoting *Sebastian-Voor Props., LLC v. Lexington-Fayette Urb. Cty. Gov't*, 265 S.W.3d 190, 194-95 (Ky. 2008)). Thus, "equitable estoppel requires both a

material misrepresentation by one party and reliance by the other party[.]" *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 62 (Ky. 2010). This record does not support a factual finding that the Cabinet's conduct amounted to a misrepresentation or concealment of material facts upon which the Baties relied. Nor is there any evidence the Cabinet intended or expected the Baties to do anything in reliance on the Cabinet's words or deeds.[21]

Furthermore, this case involves a state agency and specific rules govern application of equitable estoppel when a state agency is the defendant. The circuit court never addressed these rules. "[E]quitable estoppel cannot be applied against a state agency absent exceptional circumstances." *Bd. of Trustees, Kentucky Retirement Sys. v. Grant*, 257 S.W.3d 591, 594 (Ky. App. 2008); *see also Spalding v. Marion Cty. Bd. of Educ.*, 452 S.W.3d 611 (Ky. App. 2014). "Circumstances that are so exceptional as to allows [*sic*] equitable estoppel against a government agency, we think, must include some gross inequity between the parties." *City of Shelbyville ex rel. Shelbyville Mun. Water and Sewer Comm'n v. Commonwealth*, 706 S.W.2d 426, 430 (Ky. App. 1986). Equitable estoppel "serves to offset the benefit that the offending party would otherwise derive from the conduct." *Akers*, 171 S.W.3d at 743. We fail to see any benefit derived by the

---

[21] During the hearing on the Cabinet's CR 59 motion, it was suggested that Cabinet workers were ill-motivated. However, even if the Cabinet's conduct could be called indolent or negligent, this alone would not support proper application of the estoppel doctrine.

Cabinet.  We also see no circumstances so exceptional they would clear the high hurdle for applying the doctrine.  Most importantly, the circuit court failed to identify such circumstances for this Court to review and our independent review of the record failed to find any.  We especially note that the circuit court even stated it was unaware of any benefit the Cabinet would receive by its actions, a necessary predicate to the doctrine's applicability to the Cabinet.  (R. 182.)

Therefore, for the foregoing reasons, the circuit court erred by applying equitable estoppel to deprive the Cabinet of the benefit of its defense that the Baties lacked standing to pursue the claims in their petition.

## VOIDABILITY OF THE ORDERS

The Baties' lack of standing does not make the circuit court's orders void *ab initio*, and the orders are not incurable legal nullities entitled to no deference by any court of the Commonwealth.  *See Mathews v. Mathews*, 731 S.W.2d 832, 833 (Ky. App. 1987) (distinguishing voidable judgment from void judgment, noting the latter "is not entitled to any respect or deference by the courts of the Commonwealth"); *Foremost Ins. Co. v. Whitaker*, 892 S.W.2d 607, 610 (Ky. App. 1995) (same; judgment void *ab initio* is "a legal nullity, and a court has no discretion in determining whether it should be set aside").  The defect in the circuit court's voidable orders is not incurable because the Cabinet's waiver of its defense at any time before this Opinion is rendered could cure the defect.

In fact, it is the very ability to waive standing that makes such a judgment voidable and not void *ab initio*. *Basin Energy Co. v. Howard*, 447 S.W.3d 179, 187 (Ky. App. 2014) (citing *Hisle v. Lexington-Fayette Urban Cty. Gov't*, 258 S.W.3d 422, 431 (Ky. App. 2008)) (if a court acts "outside its particular-case jurisdiction, its acts are voidable, but not void . . . because the parties can waive particular-case jurisdictional defects."). "Once a court has acquired subject matter and personal jurisdiction," as the Boyd Circuit Court did here, the Cabinet's "challenges to its subsequent rulings and judgment are questions incident to the exercise of jurisdiction rather than to the *existence* of jurisdiction." *Commonwealth v. Steadman*, 411 S.W.3d 717, 722 (Ky. 2013) (quoting *Hisle*, 258 S.W.3d at 429-30; additional citations omitted). We therefore focus on the circuit court's exercise of its subject matter jurisdiction rather than on the non-existence of its particular-case jurisdiction.

A court only "*may* have improperly exercised its general jurisdiction over child custody matters" by adjudicating the claim of a petitioner lacking standing. *Harrison*, 323 S.W.3d at 706 (emphasis added). Whether the exercise was "improper" first depends on whether anyone objects. If no one objects in a timely manner, there is no reason to prevent the circuit court from adjudicating whatever controversy can be identified. *Id. passim*.

Here, the Cabinet timely objected, and we concluded the circuit court erred in the exercise of its jurisdiction in favor of the Baties who had no standing to bring the petition. That makes the custody order merely "subject to being set aside retroactively to its date of entry . . . ." *Berry v. Cabinet for Families & Children ex rel. Howard*, 998 S.W.2d 464, 467-68 (Ky. 1999).

The well-acknowledged rule is that, because orders of a court acting without jurisdiction are incurable legal nullities and void *ab initio*, they are entitled to no deference by any court including the reviewing court which has no discretion but to set them aside. *Foremost Ins.*, 892 S.W.2d at 610. By negative implication, this rule implies the converse is true regarding orders that are not incurable legal nullities but merely voidable – *i.e.*, that under some circumstances, such voidable orders might be entitled to some deference, being merely improper exercises of properly acquired jurisdiction. If this is a correct statement of law, this Court might be able to affirm the circuit court's custody order and its subsequent order instructing the twins' delivery to the Baties. That is a tempting proposition because it seems to this Court the substance of the circuit court's decisions and the logic behind them are sound and supported by substantial evidence.

However, although this Court has identified the legal error, it is not the best forum to provide the cure. Our decision to grant the Cabinet's prayer for relief in the form of reversal and remand with instructions to dismiss the petition

presents the Cabinet and the lower courts with a new, perhaps novel, set of circumstances those courts are better able to address within their jurisdiction.

As noted, the district court reserved leave to re-docket the DNA actions should the circuit court's orders be remanded. That ruling was prophetic. Now, the Cabinet will have to decide whether to seek re-docketing, whether to seek enforcement of the commitment order, whether to request the twins' return to Kentucky, whether to pursue an ICPC assessment of the Baties' home in Michigan, and perhaps whether to pursue other matters this Court has yet to contemplate.

Regardless of any deference our jurisprudence may allow the circuit court's orders, the district court might well face difficult decisions in response to the Cabinet's entreaties, made all the more challenging by the twins' residence with the Baties for more than a year. Nevertheless, we are confident in the court's ability to make those difficult decisions.

Finally, we cannot ignore the fact that seeping to the surface of this appeal is the Baties' unaverred but passionately argued protest so evident in the action below and in the briefs to this Court – their displeasure with the Cabinet for failing to discover they were related to the twins in time to be considered a preferred placement during the temporary removal phase. We will neither defend nor condemn the Cabinet workers for conduct that certainly contributed to the need for Kentucky courts to make these hard decisions. The Baties' concern, though

legitimate, does not amount to a cognizable claim for which relief can be granted. It is cause, however, for the Cabinet to improve its performance and assure its workers satisfy its statutory duties to the best of their abilities.

To the extent it is necessary to mete out blame, more than the lion's share goes to Mother and Father. Who better to identify the Baties to the Cabinet? Not doing so was among their several amoral choices that created this catastrophe. Despite the Baties' criticism of the Cabinet and its workers, the record reveals every individual involved demonstrated a caring and concern eclipsing that of the people who should have cared the most.

We do not repeat often enough that parental rights are "coupled with the high duty" of parents to care for a child they together conceive and deliver into the world. *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000); *see also Morton v. Tipton*, 569 S.W.3d 388, 397 (Ky. 2019). It is a "primary function" of procreators to be responsible for each child's "preparation for obligations the state can neither supply nor hinder." *Id.* It was Mother and Father who failed the Baties. Mostly, they failed the twins by discarding them with little concern and without taking the least step to assure a hope they would be entrusted to the loving care of relatives. And yet, the imperfect statutory scheme, created and administered by imperfect beings in all

three branches of government, still served as a safety net despite the flaws in its fabric.

## CONCLUSION

For the foregoing reasons, the Boyd Circuit Court's April 19, 2021 order awarding custody of the twins to the Baties is hereby reversed, and this case is remanded to the circuit court with instructions to dismiss the Baties' petition for the custody of the twins.

ALL CONCUR.

| BRIEFS FOR APPELLANT COMMONWEALTH OF KENTUCKY, CABINET FOR HEALTH AND FAMILY SERVICES: | BRIEF FOR APPELLEES LATANYA BATIE AND ARNOLD BATIE, IV: |
|---|---|
| Matthew Perdue<br>Ashland, Kentucky | Tracy D. Frye<br>Marie E. Troxler<br>Russell, Kentucky |
| | BRIEF FOR APPELLEE JAMES WILLIAMS: |
| | Sharon Rowsey<br>Ashland, Kentucky |